80 N.J. Super. 283 (1963)
193 A.2d 412
TIDEWATER OIL COMPANY, A CORPORATION, GEO. D. EMERY COMPANY, A CORPORATION, AND ZOLTON YUHASZ AND FLORENCE YUHASZ, HIS WIFE, PLAINTIFFS, AND M & T CHEMICALS, INC., INTERVENOR,
v.
MAYOR AND COUNCIL OF THE BOROUGH OF CARTERET, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, AND EDWARD ZANAT, BUILDING INSPECTOR OF THE BOROUGH OF CARTERET, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided July 23, 1963.
*285 Mr. Lewis S. Jacobson for plaintiffs (Mr. Sam Weiss, on the brief; Messrs. Jacobson & Winter, attorneys).
Mr. Emory C. Risley for intervenor (Messrs. Stryker, Tams & Dill, attorneys).
Mr. Benedict W. Harrington for defendants (Messrs. Kessler, Kessler & Harrington, attorneys).
FURMAN, J.S.C.
The zoning ordinance of the borough of Carteret, enacted May 8, 1963, is under attack for constitutional and statutory flaws. The plaintiffs are the owner and the contract purchaser of premises fronting on the Arthur Kill in the Heavy Industrial B Zone and two individual citizens and taxpayers. The intervening plaintiff is the owner of premises adjoining the plaintiffs' in the B zone, which it has listed with real estate brokers for sale as an industrial property. The present land uses are a lumber business on the plaintiffs' property and a varied metallurgical and chemical industry on the intervenor's property, including detinning of tin scrap and manufacture of organic solvents. Plaintiff Tidewater Oil Company proposes to operate a petroleum storage tank terminal.
The Borough of Carteret is four square miles in area, with a population in excess of 20,000. Its easterly boundary is the Arthur Kill. Its northerly boundary is the Rahway River. The Arthur Kill, dividing New Jersey and Staten Island, *286 has a dredged 35-foot channel at or near the pier line on the Carteret shore. The Rahway River has a mean depth of 25 feet for a short distance upstream from its junction with the Arthur Kill. Thereafter its channel adjoining Carteret is four to nine feet and not navigable by ocean-going tankers.
The borough enacted its first zoning ordinance in December 1958. The Heavy Industrial Zone comprised the entire waterfront along the Arthur Kill and the waterfront along the Rahway River from the Arthur Kill west to the New Jersey Turnpike. While the district varied in depth inland from the waterways, most of its southerly portion extended 1,000 to 2,000 feet from the Arthur Kill to Roosevelt Avenue and most of its northerly portion extended about 3,000 feet from the Rahway River to Roosevelt Avenue, which makes a right-angle turn from a north-south to an east-west thoroughfare.
The designation as heavy industrial conformed to the character of the district for 60 years or longer. Much of the land is reclaimed by fill. Heavy industry, including petroleum storage facilities, chemical, fertilizer and other manufacturing industries are massed along the Arthur Kill. Some undeveloped land with pockets of marshland and tidal creeks is south of the Rahway River. Two large petroleum tank "farms" are north of Roosevelt Avenue. Storage tanks for naphtha and sulfur are south and east of Roosevelt Avenue. A major chemical industry located here after 1958 but most of the changes in the intervening period involved plant additions or improvements.
The adjoining residential and business zones likewise retained their essential character between 1958 and 1963, built-up and heavily populated. New home construction was minimal except in housing developments one-half mile or more from the Heavy Industrial Zone and a senior citizens housing project with nine buildings and 50 units completed in 1962 within a short distance of the plaintiffs' and intervenor's properties.
The zoning ordinance of 1958 was ruled invalid for procedural defects in a letter opinion by Judge Molineux in Cinege *287 v. Borough of Carteret. No judgment was filed because of a stipulation of dismissal. Plaintiff Tidewater Oil Company broached its plan to construct a petroleum storage tank terminal in Carteret to borough officials, including the then mayor and members of the council, in the summer of 1962. A use permit was requisite under the 1958 ordinance, contingent upon proof to the board of adjustment that a proposed industry was not dangerous or objectionable to the public. Tidewater proceeded in conformity with the 1958 ordinance. The preliminary negotiations raised no serious objections. Tidewater agreed to build an off-street parking area and a Little League baseball field, to plant trees and shrubs along Roosevelt Avenue and to participate pro rata with other industries in the event the borough condemned land of the Central Railroad of New Jersey for a public road bisecting various industrial properties parallel to the Arthur Kill and Roosevelt Avenue.
A new mayor and two new members of the six-member council assumed office on January 1, 1963. The plaintiffs applied for a building permit and a use permit for the construction of a petroleum storage tank terminal on February 1, 1963. An unofficial meeting was held by the members of the governing body 11 days later. About 150 citizens attended. Opposition to Tidewater was vehement and overwhelming. Councilman Hutnick moved with a second that Tidewater be kept out of the Borough of Carteret. The board of adjustment held a public hearing on the use permit application on February 26 and March 5, 1963, but adjourned for 60 days without concluding the hearing and without a decision, upon advice from Mayor Banick and Councilman Boncelet that a new zoning ordinance affecting the plaintiffs' property was under consideration.
On February 28, 1963 the planning board discussed for an hour or more a proposal to divide the Heavy Industrial Zone into A and B zones, with restrictions against petroleum industries in the latter zone. An amendment to the zoning ordinance of December 1958 accomplishing this result was *288 drafted with the participation of the planning board and recommended for adoption to the governing body, at a special meeting of the planning board on March 5, 1963. The governing body enacted this amendment on March 20, 1963. The area in the Heavy Industrial Zone south of Roosevelt Avenue, including the plaintiffs' and intervenor's properties, was established as the B zone.
This zoning amendment remained in force less than two months. The council members and the incoming mayor viewed with concern the continuing doubtful validity of the 1958 ordinance. The planning board considered a complete new ordinance at a regular meeting on March 28, 1963 and voted to recommend its enactment at a special meeting on April 1, 1963. The borough council adopted it on May 8, 1963. The Heavy Industrial A Zone, north of Roosevelt Avenue, and the Heavy Industrial B Zone, south of Roosevelt Avenue, are identical with the zones which were created by the amendment of March 20, 1963. As pertinent here, the zoning ordinance of May 8, 1963 permits heavy industrial uses in both A and B zones, except that the following uses are permitted in the A zone but prohibited in the B zone:
"The storage, manufacturing, refining or blending, of oil, oils, gas, gasoline, petroleum, crude oil, tars or any of the volatile, flammable, or explosive component parts of oil, gasoline, kerosene, petroleum, or crude oil or oils, or any of the inflammable, volatile or explosive liquids which are or can be derivative from gasoline, crude oil, tars or parts thereof, excepting however, storage of oil, fuel oil, gas or gasoline or petroleum for on-the-premises consumption for heat, fuel, power or other required consumption on the same premises in said zone where they are stored or maintained, and not for off-the-premises distribution or consumption.
No tanks or other containers or structures for storage or maintenance of such articles for off-the-premises distribution, use or consumption shall be erected, built, constructed, maintained, used or operated but only such as are essential for on-the-premises consumption in connection with a manufacturing or processing use or pursuit of another nature permitted in said zone. The lone exceptions will be those persons, companies, corporations, etc. who are and have been carrying on such functions or operations prior to the date of the adoption of the ordinance."
*289 The plaintiffs assert the zoning ordinance should be set aside because of noncompliance with N.J.S.A. 40:55-35, which requires submission of proposed zoning enactments to the planning board, and with N.J.S.A. 10:4-1, the "Right to Know" Law. In addition, both the plaintiffs and the intervenor challenge the restriction against petroleum industries in the Heavy Industrial B zone as arbitrary, without reasonable relation to the statutory zoning purposes (R.S. 40:55-32), and as discriminatory in its classification of permitted and prohibited uses. A further contention that the plaintiffs were entitled to building and use permits because of expenditures and commitments in reliance upon prior law must be stricken for lack of supporting proof. See Crecca v. Nucera, 52 N.J. Super. 279 (App. Div. 1958).
The court is satisfied that neither N.J.S.A. 40:55-35 nor N.J.S.A. 10:4-1 was violated in the planning board procedure. The planning board discussed the proposed division into Heavy Industral A and B Zones at two regular and two special meetings. The regular meeting of March 28, 1963 was legally advertised as a public hearing on the ordinance ultimately adopted. No newspaper notice was published of the meeting of April 1, 1963 when the planning board voted to recommend adoption of the new zoning ordinance. An arrow sign directed members of the public to the meeting room, the public was not barred, the door of the meeting room was open throughout and a newspaper reporter was in attendance. Newspaper notice or advertisement is not a sine qua non for a public meeting. The meeting of April 1, 1963 was a public meeting, not a secret caucus or executive session. Cf. Wolf v. Zoning Board of Adjustment of Park Ridge, 79 N.J. Super. 546 (App. Div. decided June 25, 1963).
The planning board transmitted the new zoning ordinance with map and an accompanying letter stating its approval to the mayor and council, subsequent to the April 1, 1963 meeting. In addition to the specific documents, which are self-explanatory, the members of the governing body had available *290 the planning board minutes setting forth details of its consideration of the zoning amendment which it participated in drafting prior to its adoption on March 20, 1963, and of the identical provisions of the new ordinance of May 8, 1963.
With the determination of the procedural issues against the plaintiffs, the court must test the constitutional and statutory sufficiency of the zoning ordinance of the Borough of Carteret, under substantive principles applied to the facts in proof. The municipal zoning power, specifically authorized by N.J. Const., Art. IV, § VI, par. 2, and subject to liberal construction by Art. IV, § VII, par. 11, may be exercised for the following purposes pursuant to R.S. 40:55-32:
"Such regulations shall be in accordance with a comprehensive plan and designed for one or more of the following purposes: to lessen congestion in the streets; secure safety from fire, panic and other dangers; promote health, morals or the general welfare; provide adequate light and air; prevent the overcrowding of land or buildings; avoid undue concentration of population. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality."
The decisive issue is whether the exclusion of new petroleum industries in the Heavy Industrial B Zone is in accordance with a classification of land uses reasonably related to and in furtherance of one or more of the statutory zoning purposes. The exclusion is broad. Storage, manufacturing, refining and blending of petroleum, gasoline, oils, tars, any of their volatile, inflammable or explosive components, or any of the volatile, inflammable or explosive liquids which are or can be derivative from gasoline, crude oil or tars are prohibited in the B zone, except for consumption on the premises for heat, fuel, power or in connection with a permitted manufacturing or processing use.
Without detailed expert testimony, the court cannot specify the exact number of nonconforming uses created in the B zone by the zoning amendment of March 20, 1963 and the comprehensive *291 enactment of May 8, 1963. A majority of the organic chemicals in general industrial use are petroleum based. Substantially all of them may be derived from petroleum and thus meet the B zone restriction, although manufactured in practice from other hydrocarbons. Manufacture or storage of naphtha and benzene by other industries in the B zone and manufacture of various coatings by the intervenor would be barred as new uses.
The Arthur Kill waterfront in the Borough of Carteret is prime land for heavy industry operating by deep-water shipment of raw materials and rail, highway or barge reshipment of products. It is in the category of a natural resource. Plaintiff Tidewater examined 40 sites in the New York metropolitan area and picked its proposed Carteret site as one of three most advantageous. The land elevations are higher on the average in the B zone than in the A zone, without marshland or tidal creeks. The available land for new industry in the A zone fronts on the Rahway River, which lacks a deep-water channel. A municipality may seek a balancing of heavy and light industry through planning and zoning. It may not exclude an extensive segment of heavy industry as a new use, in this case the petroleum, organic chemical and related manufacturing and processing industries, although permitted in another district, unless the prohibition is reasonably founded upon one or more of the legislative zoning objectives.
In determining the reasonableness of such an enactment, the court may consider the physical characteristics and suitability of the districts in which an industry is permitted and in which it is barred, and the extent of existing operations in the industry in both districts, elsewhere in the municipality and in nearby municipalities. The creation of nonconforming uses is evidential that a zoning ordinance does not reasonably fulfill the statutory purpose of encouraging the most appropriate use of land throughout the municipality. Zampieri v. River Vale Tp., 29 N.J. 599, 607 (1959).
The evidence before this court is that industries prohibited in the Heavy Industrial B zone are operating on a widespread *292 scale in both the A and B zones and in nearby municipalities along the Arthur Kill, that the B zone is suited to them because of its land elevations and access to deep water and reshipment facilities; that the undeveloped land in the A zone is less suited to them, and that both A and B zones abut upon residential and business concentrations.
The plaintiffs contend that the officials of the Borough of Carteret had a predominant purpose to block Tidewater. Undoubtedly the Tidewater application alerted them to possible objections concerned with public health and safety, as well as to public opposition. A municipality need not anticipate all objectionable land uses. Upon learning that one is proposed, it may legislate to bar it through its zoning power. Unless in bad faith, an ordinance is not invalid per se because designed against one property owner, if reasonably related to the statutory zoning purposes. The court finds no bad faith in the zoning enactment of the Borough of Carteret.
In determining the reasonableness of legislation, a court may search out the factors impelling it and its apparent objectives. Zampieri v. River Vale Tp., supra, and Glen Rock Realty Co. v. Board of Adjustment, etc., of Glen Rock, 80 N.J. Super. 79 (App. Div. decided July 3, 1963). Because of the testimony of all but one member of the governing body and most members of the planning board, speculation is at a minimum. Their concern was with the threat of fires and explosions, both on the premises and in tank trucks passing through the public streets, with added traffic congestion and with the loss of employment opportunities.
Legislation may attack an evil where it is worst. Two Guys From Harrison, Inc. v. Furman, 32 N.J. 199, 229 (1960). Two preliminary comments are appropriate. All factors bearing upon fire and traffic safety and traffic volume apply to new petroleum or related industries in the A zone as well as in the B zone. Existing petroleum storage tanks in the A zone are within 300 to 400 feet of dwelling houses. Tank trucks making deliveries and shipments from either zone would pass through residential and business areas, by *293 schools and churches. One slight distinction is that the route is longer from most points in the B zone to the New Jersey Turnpike interchange at Roosevelt Avenue in Carteret.
Secondly, permitted industries in the B zone are serviced by trucks, in many cases heavy trucks. But the governing body may have considered that tank trucks up to 44 feet in length were a recognized problem and that it need not conjecture that other industries might generate as much or more traffic with trucks of comparable lengths.
The evidence on the threat of fires and explosions dealt exclusively with petroleum storage facilities and tank trucks. Expert witnesses developed to the satisfaction of the court that a petroleum storage terminal is a relatively safe installation, rated as a lower fire risk than, for example, a lumber business. Scientific advances have reduced the fire and explosion threat to negligibility. Floating roofs eliminate the vapor space. Venting techniques to eliminate pressure are improved. The conversions from rolled to extruded steel and from riveting to welding have virtually eliminated the possibility of tank rupture. Other safeguards are foam chambers and dikes. Similar advances in technique have substantially foreclosed the threat of fire, explosion or rupture in tank trucks even upon collision. The borough has experienced only two accidents involving tank trucks since 1950.
A municipality acting under the zoning power to secure safety from fire or explosion must take into consideration prevailing industrial techniques based upon scientific advances. A municipality may deny a use permit to a property owner who fails to avail himself of established safeguards in his plans for the construction of industrial facilities. It has other statutory remedies and common law remedies to redress nuisances. But it cannot rule out an entire industry through apprehension of safety standards deviations.
The zoning restriction under attack applies to manufacturing and processing as well as storage operations involving petroleum products. Evidence is lacking as to their fire and explosion risks. By definition volatile, inflammable or explosive *294 components or liquid derivatives of petroleum may not be manufactured or refined in the Heavy Industrial B Zone. The court must assume dangers to the public in such operations in the absence of specific countervailing testimony.
The effect of the zoning ordinance of May 8, 1963 is to permit manufacturing and processing industries labelled dangerous in Heavy Industrial A Zone and to prohibit them in Heavy Industrial B Zone. To be sustained as valid, such differing legislative treatment must be reasonably justified by distinctions between the two zones or their environs. With respect to the physical characteristics and suitability of the two zones, the evidence is plain that petroleum industries dependent upon deep water transportation must look to industrial sites along the Arthur Kill waterfront, which is in the proscribed B zone or pre-empted by existing industries in the A zone.
Between the adjoining areas no substantial distinctions are found. Numerous dwellings, both one-family and multifamily, back upon both Heavy Industrial Zones. Churches, schools and other public places dot the right-angle course of Roosevelt Avenue, the western boundary of the B zone and the southern boundary of the A zone. The individual members of the public are entitled to an equal measure of legislative protection in matters of public safety. Assuming fire and explosion hazards in the petroleum industry, the residents south of the Heavy Industrial A Zone are exposed to it, the residents west of the Heavy Industrial B Zone are shielded from it by the ordinance under attack.
The threat of traffic congestion has two aspects. More vehicles, particularly bulky vehicles, may impair traffic flow. The accident rate may increase with an added volume of traffic. Roosevelt Avenue is the main artery into and out of the Borough of Carteret. With the opening of the New Jersey Turnpike interchange, heavy truck traffic has built up along Roosevelt Avenue within the borough and from urban and industrial centers south of the borough.
*295 Roosevelt Avenue, opposite plaintiffs' property, is approximately 35 feet wide with an asphalt surface. The Columbus School is directly across from the private access road to the plaintiffs' property at the corner of Roosevelt and Carteret Avenues. By traffic counts the volume of traffic on Roosevelt Avenue is approximately one-half of capacity during most of the daylight and evening hours and close to two-thirds of capacity during peak hours. Capacity is figured as 900 vehicles, combining trucks and passenger cars, in each direction per hour. There is a school crossing on Carteret Avenue but not on Roosevelt Avenue, in view of the small number of residences east of Roosevelt Avenue.
Before the planning board and governing body plaintiff Tidewater projected truck traffic statistics for its proposed operation on the plaintiffs' property. The forecast was 95 round trips, or 190 trips in-and-out per day, with the heaviest volume about 12 trucks per hour at peak hours.
The court is satisfied that congestion from tank trucks servicing petroleum industries in the B zone would be negligible. Through the use permit technique access roads of sufficient width to prevent tank trucks' blocking two-way traffic can be assured. Carteret Avenue may by ordinance be limited to light traffic. Accordingly, no reasonable relation is found between the exclusion of petroleum industries in the Heavy Industrial B zone and the zoning objective of lessening congestion in the streets. Cf. Bogert v. Washington Twp., 25 N.J. 57, 65 (1957).
Some borough officials stressed as a factor in their legislative action the employment advantages of manufacturing and processing industries in contrast to storage operations. The zoning ordinance of May 8, 1963 is not so drawn. As discussed supra, manufacturing and processing as well as storage of petroleum, its components and derivatives are barred. A zoning ordinance cannot be defended constitutionally on a ground inapplicable to it, by conjecture that it might apply to and support another zoning ordinance.
*296 A further objectionable aspect of the zoning ordinance under attack should be pointed out. By its specific terms nonconforming uses in the Heavy Industrial B zone may be expanded. The statutory sanction of pre-existing nonconforming uses (R.S. 40:55-48) is designed to guarantee constitutional rights. Authorization to increase or enlarge nonconforming uses is not constitutionally mandatory but derogates from and tends to nullify valid legislative objectives.
The court therefore determines that the exclusion of new petroleum industries in the Heavy Industrial B zone is not in accordance with a classification of land uses reasonably related to and in furtherance of the statutory zoning purposes.